# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEST PALM BEACH POLICE PENSION FUND, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br> v. <br><br> SELECTQUOTE, INC., TIMOTHY DANKER, RAFFAELE SADUN, DONALD HAWKS III, WILLIAM TOM GRANT, DONALD BRITTON, EARL DEVANNY III, DENISE DEVINE, RAYMOND WELDON, CREDIT SUISSE SECURITIES (USA) LLC, EVERCORE GROUP L.L.C., BARCLAYS CAPITAL INC., CITIGROUP GLOBAL MARKETS INC., MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, JEFFERIES LLC, CANTOR FITZGERALD & CO., KEEFE BRUYETTE & WOODS, INC., PIPER SANDLER & CO., and DREXEL HAMILTON LLC, <br><br> Defendants. | Case No. 1:21-cv-8279 <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff West Palm Beach Police Pension Fund ("West Palm Beach Police" or the "Plaintiff"), individually and on behalf of all others similarly situated, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SelectQuote, Inc. ("SelectQuote" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c)

analyst and media reports concerning SelectQuote; and (d) other public information concerning SelectQuote.

## INTRODUCTION

1.      This is a class action on behalf of persons and entities that: (a) purchased SelectQuote shares in or traceable to the Company's initial public offering of common stock conducted on or around May 20, 2020 (the "Offering"); and/or (b) purchased shares of SelectQuote's common stock between May 20, 2020 and August 25, 2021, inclusive (the "Class Period").

2.      The claims asserted herein are alleged against SelectQuote and certain of the Company's officers, SelectQuote's Board of Directors, including the directors that signed the Registration Statement (defined below) for the Offering, and the underwriters of the Offering (collectively, "Defendants"), and arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.      SelectQuote is a direct-to-consumer insurance distribution platform that offers senior health, life, and auto & home insurance policies from a curated panel of insurance carriers. A significant majority of the policies SelectQuote sells are Medicare Advantage and Medicare Supplement plans.    This matter arises from Defendants' material misrepresentations and omissions regarding the revenue the Company earned from Medicare Advantage and Medicare Supplement policy renewals.

4.      Beginning at age 65, Americans are eligible for federal health insurance coverage known as Medicare ("Original Medicare").  An alternative to this coverage, known as Medicare Advantage, is offered to Medicare-eligible patients by private health insurance companies as an

alternative to Original Medicare, and includes the same benefits as Original Medicare, but often includes additional coverage such as prescription drugs or vision and dental benefits.  Medicare Supplement plans work in tandem with Original Medicare to provide patients with additional coverage.

5.     Although exceptions exist, most Americans enroll in or make changes to their Medicare Advantage plans between October 15 and December 7, which is the Medicare Annual Enrollment Period ("AEP").  Beginning in 2019, however, Medicare patients were given a new opportunity to make adjustments to their Medicare Advantage Plans outside the AEP.  Now, after an individual has enrolled in a Medicare Advantage Plan, they are permitted to make a one-time plan change during the Medicare Advantage Open Enrollment Period ("OEP"), which runs from January 1 to March 31 of each year.

6.     Insurance policies are often grouped by their effective date into yearly cohorts.  Prior to the Class Period, SelectQuote enrolled the Company's 2019 cohort, made up of all polices with a policy effective date in 2019.  The 2019 cohort was the first cohort to be impacted by the new OEP and the rapid disenrollment that was permitted.

7.     As an insurance broker, when SelectQuote sells a policy, accounting rules allow it to book as revenue the entire lifetime value ("LTV") of commissions at the time the policy is sold.  That revenue includes not only the contracted commission rate for the one-year policy contract, but also an estimate of commissions on future policy renewals.  The contracted commission rate is booked as cash, the estimated future renewal commission is booked as accounts receivable, and the total figure is recognized as revenue in the period in which the policy is sold.  Under Generally Accepted Accounting Principles ("GAAP"), the Company must

write down the recognized revenue from future commissions as soon as it becomes probable that the policy will not be renewed.

8.      The Class Period begins on May 20, 2020, when the Company conducted the Offering, through which more than 18 million shares of SelectQuote common stock were sold at $20 per share, with SelectQuote reaping over $360 million in gross proceeds.

9.      Prior to the Offering, SelectQuote began experiencing lower-than-expected renewal rates, known as persistency rates, for its 2019 cohort.  This decline coincided with the initiation of the Medicare Advantage OEP and customers' new ability to make changes to their insurance plans during the first quarter of their policy year.  As a result of this rapid disenrollment, by 2019 the actual renewal commissions SelectQuote earned were falling far below the estimated future renewal commission it had already recognized as revenue.

10.     However, in the Offering Materials (defined below) issued in connection with the Offering, Defendants did not disclose that, as a result of the rapid disenrollment it had been experiencing, the Company's reported revenues, earnings, accounts receivable, and lifetime value of commissions per approved policy were improperly inflated.  In addition, Defendants failed to disclose this known trend.

11.     During the Offering and continuing throughout the Class Period, the Company repeatedly reported inflated revenues, earnings, and accounts receivable, as well as the revenue per policy and lifetime value per policy.  Despite receiving persistency data twice each year that showed SelectQuote's actual renewals were far below the estimates used to calculate the LTV portion of recognized revenue, the Company did not make the necessary adjustments to its financial statements.  As a result of these misrepresentations, SelectQuote shares traded at artificially inflated price throughout the Class Period.

12.     The truth began to emerge on May 11, 2021, when SelectQuote disclosed that its fourth quarter 2020 results would be impacted by a "negative cohort and tail adjustment" due to "lower second-term persistency for the 2019 cohort," which SelectQuote attributed to the OEP and increased "switching activity."   These disclosures caused the Company's share price to decline by $5.50 per share, or 20%.

13.     Then, on August 25, 2021, SelectQuote disclosed that lack of policy renewals affected both the 2019 and 2020 cohorts, and that the Company was including a $65 million placeholder for the risk of an additional cohort tail adjustment the following year, driven mostly by lower-than-anticipated persistency results in the 2020 cohort. [1]   As a result of these disclosures, SelectQuote's share price declined by an additional $6.46 per share, or 45%.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated under those sections, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). The Underwriter Defendants (defined below) are all based in or maintain offices in this District.

Many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District.  In addition, at all relevant times SelectQuote's common stock was offered, sold, and traded on the New York Stock Exchange ("NYSE"), which is located in this District.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

**A. Plaintiff**

18.    Plaintiff West Palm Beach Police is a pension plan providing benefits for eligible police officers in West Palm Beach, Florida.  As of December 31, 2021, Plaintiff manages approximately $450 million in assets on behalf of over 500 participants.  As set forth in the accompanying certification, Plaintiff purchased SelectQuote common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Corporate Defendant**

19.    Defendant SelectQuote is incorporated under the laws of Delaware with its principal executive offices located in Overland Park, Kansas.  The Company is the issuer of the common stock shares sold in the Offering.  SelectQuote's common stock trades on the NYSE under the symbol "SLQT."  As of August 25, 2021, SelectQuote had over 165 million shares of common stock outstanding.

---

[1] SelectQuote's fiscal year runs from July 1 to June 30.

### C.  Officer Defendants

20.     Defendant Timothy Danker ("Danker") is, and was at all relevant times, the Chief Executive Officer ("CEO") of SelectQuote.  Defendant Danker signed the Offering Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

21.     Defendant Raffaele Sadun ("Sadun") is, and was at all relevant times, the Chief Financial Officer ("CFO") of SelectQuote.  Defendant Sadun signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

22.     Defendants Danker and Sadun are collectively referred to herein as the "Officer Defendants."  The Officer Defendants, because of their positions with SelectQuote, possessed the power and authority to control the contents of SelectQuote's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

### D.  Director Defendants

23.     Defendant Donald Hawks III ("Hawks") is, and was at all relevant times, Chairman of the Board of Directors of SelectQuote.  Defendant Hawks signed the Registration

Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

24.     Defendant William Tom Grant ("Grant") is, and was at all relevant times, the Vice Chairman of the Board of Directors of SelectQuote.   Defendant Grant signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

25.     Defendant Donald Britton ("Britton") was appointed as a member of SelectQuote's Board of Directors in 2014 and served in that capacity until September 23, 2020. Defendant Britton signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

26.     Defendant Earl Devanny III ("Devanny") was appointed as a member of SelectQuote's Board of Directors in February 2020.  Defendant Devanny signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

27.     Defendant Denise Devine ("Devine") was appointed as a member of SelectQuote's Board of Directors in February 2020.  Defendant Devine signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

28.     Defendant Raymond Weldon ("Weldon") was appointed as a member of SelectQuote's Board of Directors in 2014.  Defendant Weldon signed the Registration Statement for the Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

29.     Defendants Hawks, Grant, Britton, Devanny, Devine, and Weldon are collectively referred to hereinafter as the "Director Defendants."  The Officer Defendants and the Director Defendants are collectively referred to hereinafter as the "Individual Defendants."  Each of the Individual Defendants signed the Registration Statement.  In addition, as Directors and/or executive officers of the Company, the Individual Defendants participated in the solicitation and sale of SelectQuote shares to investors in the Offering for their own benefit and the benefit of SelectQuote.  The Individual Defendants, because of their positions with SelectQuote, possessed the power and authority to control the contents of the Offering Materials.

**E.  Underwriter Defendants**

30.     Defendant Credit Suisse Securities (USA) LLC ("CreditSuisse") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering.  As an underwriter of the Offering, CreditSuisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

31.     Defendant Evercore Group L.L.C. ("Evercore ISI") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering.  As an underwriter of the Offering, Evercore ISI was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

32.     Defendant Barclays Capital Inc. ("Barclays") served as a joint bookrunner underwriter for the Offering and sold over one million SelectQuote shares in the Offering.  As an underwriter of the Offering, Barclays was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

33.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as a joint bookrunner underwriter for the Offering and over one million SelectQuote shares in the Offering. As an underwriter of the Offering, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

34.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering. As an underwriter of the Offering, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

35.     Defendant RBC Capital Markets, LLC ("RBC Capital Markets") served as a joint bookrunner underwriter for the Offering and sold millions of SelectQuote shares in the Offering. As an underwriter of the Offering, RBC Capital Markets was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

36.     Defendant Jefferies LLC ("Jefferies") served as a joint bookrunner underwriter for the Offering and sold over one million SelectQuote shares in the Offering.  As an underwriter of the Offering, Jefferies was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

37.     Defendant Cantor Fitzgerald & Co. ("Cantor") served as a co-manager underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering.   As an underwriter of the Offering, Cantor was responsible for ensuring the

truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

38.     Defendant Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette & Woods") served as a co-manager underwriter for the Offering and sold hundreds of thousands of SelectQuote shares in the Offering.  As an underwriter of the Offering, Keefe Bruyette & Woods was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

39.     Defendant Piper Sandler & Co. ("Piper Sandler") served as a co-manager underwriter for the Offering and hundreds of thousands of SelectQuote shares in the Offering. As an underwriter of the Offering, Piper Sandler was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

40.     Defendant Drexel Hamilton, LLC ("Drexel Hamilton") served as a co-manager underwriter for the Offering and sold over one hundred thousand SelectQuote shares in the Offering.  As an underwriter of the Offering, Drexel Hamilton was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.

41.     Defendants CreditSuisse, Evercore ISI, Barclays, Citigroup, Morgan Stanley, RBC Capital Markets, Jefferies, Cantor, Keefe Bruyette & Woods, Piper Sandler, and Drexel Hamilton are collectively referred to hereinafter as the "Underwriter Defendants."

## BACKGROUND

42.     SelectQuote is a direct-to-consumer distribution platform that offers complex senior health, life, and auto & home insurance policies from a curated panel of insurance carriers.

The vast majority of the policies the Company sells are Medicare Advantage and Medicare Supplement plans, which accounted for 78% of the Company's policies written in 2019.

43.     As an insurance broker, when SelectQuote sells a policy, accounting rules allow the Company to book as revenue the entire lifetime value of commissions at the time the policy is sold.  That revenue includes not only the contracted commission rate for the one-year policy contract, but also an estimate of future renewal commissions.  The contracted commission is booked as cash, the estimated future renewal commission is booked as accounts receivable, and the total figure is recognized as revenue in the period in which the policy is sold.

44.     Although this method of revenue recognition is permissible under ASC Rule 606, GAAP requires the Company to adjust its financial statements as soon as it becomes probable that the underlying policies will not be renewed.

45.     Beginning in 2019, SelectQuote's renewal rates were impacted by an additional enrollment period – the Medicare Advantage OEP – that serves as a second chance for patients who had enrolled in a Medicare Advantage plan during the AEP and wanted to switch back to a different Medicare Advantage Plan or revert back to Original Medicare.  Importantly, the OEP created a new trend of "rapid disenrollment," where customers who enrolled during the AEP between October and December were permitted to, and indeed did, change their plans mere months later during the OEP.

46.     Here, SelectQuote was required to write down the future commissions portion of its recognized revenue as soon as it learned of the lowered persistency rates among the 2019 cohort, and it became probable that the renewal rates underlying the Company's future commissions calculations would not be realized.

47.     Rather than adjust the Company's financial statements to write down the revenue as soon as it became probable that the policies would not be renewed at the estimated rates previously reported – as it was required to do – SelectQuote made no adjustments to previously recognized revenue.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

48.     The Class Period begins on May 20, 2020, when the SEC declared SelectQuote's registration statement for the Offering effective.   On or around May 20, 2020, SelectQuote conducted an Offering pursuant to a registration statement that the Company filed with the SEC on November 27, 2019 and which, after six amendments, was declared effective by the SEC on May 20, 2020 (the "Registration Statement").   On May 22, 2020, SelectQuote filed a prospectus for the Offering on Form 424B4 (the "Prospectus"), which formed part of the Registration Statement (collectively, the "Offering Materials").   The Registration Statement was signed by the Individual Defendants.   By means of the Offering Materials, SelectQuote offered and sold more than 18 million shares of common stock (which included the underwriters' exercise in full of their option to purchase an additional 4.275 million million shares of common stock) at $20 per share, resulting in over $360 million in gross proceeds.

49.     The Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.   For example, in the Offering Materials, SelectQuote reported total revenue of $337.5 million for the fiscal year ended 2019.   The Company also reported net income of $72.6 million and accounts receivable of $76.9 million for 2019.   In the Offering Materials, SelectQuote also reported an LTV of $1,279 per policy for Medicare Advantage policies and

$1,312 per policy for Medicare Supplement policies for 2019, as well as total revenue per Medicare Advantage and Medicare Supplement policy of $1,547 per policy for 2019.

50.    The statements set forth above in ¶49 were materially false and misleading.  In truth, SelectQuote's 2019 and 2020 cohorts were experiencing lower than estimated persistency as a result of the OEP and subsequent rapid disenrollment.  Because SelectQuote failed to write down revenue as soon as it became probable that the Company's policies would not be renewed at the estimated rates previously reported, the Company's reported revenues, earnings, and accounts receivable were improperly inflated.  In addition, SelectQuote's reported lifetime value per policy and total revenue per policy were also improperly inflated.

51.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   The failure of the Offering Materials to disclose the ongoing trend that the actual renewal commissions SelectQuote earned were falling far below the estimated future renewal commission the Company had already recognized as revenue violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income for continuing operations.

52.    On September 9, 2020, SelectQuote held a conference call with analysts and investors to discuss the Company's 2020 year-end financial results.  During the call, Defendant Sadun addressed the impact of the new OEP on the Company's lifetime value estimates.  While Defendant Sadun admitted that SelectQuote had "experienced slightly lower overall persistency"

he assured investors that "this lower persistency is included in our LTV calculations" and that "nothing has fundamentally changed on the persistency front."

53.     On September 10, 2020, the Company filed its annual report with the SEC on Form 10-K for the full year ended June 30, 2020.  The 10-K was signed by Defendants Danker, Sadun, Hawks, Grant, Britton, Devanny, Devine, and Weldon and contained certifications by Defendants Danker and Sadun that attested to the purported accuracy and completeness of the 10-K.  In the 10-K SelectQuote reported total revenue of $531.5 million in 2020, as well as reported net income of $81.1 million and accounts receivable of $83.6 million.  SelectQuote also reported an LTV of $1,287 per policy for Medicare Advantage policies and $1,376 per policy for Medicare Supplement policies in 2020, and reported total revenue per Medicare Advantage and Medicare Supplement policy of $1,485 per policy in 2020.  In addition, the 10-K reiterated the Company's reported revenue, earnings, accounts receivable, lifetime value of commissions per approved policy, and total revenue per policy for 2019.

54.     The statements set forth above in ¶¶52-53 were materially false and misleading. In truth, SelectQuote's 2019 and 2020 cohorts were experiencing lower than estimated persistency as a result of the OEP and subsequent rapid disenrollment.  Because SelectQuote failed to write down revenue as soon as it became probable that the Company's policies would not be renewed at the estimated rates previously reported, the Company's reported revenues, earnings, and accounts receivable were improperly inflated.  In addition, SelectQuote's reported lifetime value per policy and total revenue per policy were also improperly inflated.

55.     On November 5, 2020, SelectQuote held a conference call with analysts and investors to discuss the Company's 2021 first quarter results.  During the call, Defendant Sadun touted the Company's high policy renewal rate compared to its peers.  Specifically, Defendant

Sadun highlighted SelectQuote's "separation of persistency in LTV results verses [its] peers." While Defendant Sadun acknowledged once again that the Company "ha[d] experienced slightly lower overall persistency," he continued to assure investors that the "lower persistency is included in our LTV calculations" and that "nothing has changed on the persistency front since we discussed this last quarter."

56.     On November 6, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for the first quarter ended September 30, 2020.  The 10-Q was signed by Defendants Danker and Sadun and contained certifications by Defendants Danker and Sadun that attested to the purported accuracy and completeness of the 10-Q.  In the 10-Q, SelectQuote reported total revenue of $124 million for the first quarter ended September 2020.  The Company also reported a net income loss of $837,000 and accounts receivable of $69.3 million for the quarter. SelectQuote also reported an LTV of $1,168 per policy for Medicare Advantage policies and $1,274 per policy for Medicare Supplement policies for the quarter ended September 2020, as well as a total revenue per Medicare Advantage and Medicare Supplement policy of $1,501 per policy.

57.     In addition, in the November 2020 10-Q, SelectQuote reported total revenue of $65.2 million for the quarter ended September 2019, as well as a net income loss of $1.6 million and $65 million in accounts receivable.  SelectQuote also reported an LTV of $1,163 per policy for Medicare Advantage policies and $1,163 per policy for Medicare Supplement policies, as well as a total revenue per Medicare Advantage and Medicare Supplement policy of $1,504 per policy.

58.     The Statements set forth above in ¶¶55-57 were materially false and misleading. In truth, SelectQuote's 2019 and 2020 cohorts were experiencing lower than estimated

persistency as a result of the OEP and subsequent rapid disenrollment. Because SelectQuote failed to write down revenue as soon as it became probable that the Company's policies would not be renewed at the estimated rates previously reported, the Company's reported revenues, earnings, and accounts receivable were improperly inflated. In addition, SelectQuote's reported lifetime value per policy and total revenue per policy were also improperly inflated.

59.     During the Piper Sandler Health Care Conference held on December 3, 2020, SelectQuote and certain of its executives again touted the Company's high persistency rate. Specifically, when asked about SelectQuote's strong LTV figures compared to its peers, Defendant Sadun responded by saying "any way you slice it, SelectQuote earns significantly higher LTV per policy than our peers, which is primarily due to our industry-leading persistency."

60.     On February 8, 2021, the Company filed its quarterly report with the SEC on Form 10-Q for the second quarter ended December 31, 2020. The Company reported total revenue of $358.3 million for the three months ended December 2020 and $482.4 million for the six months ended December 2020. The Company also reported net income of $90.4 million for the three months ended December 2020 and $91.3 million for the six months ended December 2020, as well as and accounts receivable of $147 million for the quarter ended December 2020. SelectQuote also reported an LTV for Medicare Advantage policies of $1,268 per policy for the three months ended December 2020, and $1,251 per policy for the six months ended December 2020. For Medicare Supplement policies, SelectQuote reported an LTV of $1,233 per policy for the three months ended December 2020, and $1,248 per policy for the six months ended December 2020, and a total revenue per Medicare Advantage and Medicare Supplement of $1,483 per policy for the twelve months ended December 2020.

61.     In addition, in the February 2021 10-Q, SelectQuote reported total revenue of $176.3 million for the three months ended December 2019 and $241.5 million for the six months ended December 2019.  The Company also reported net income of $39.1 million for the three months ended December 2020 and $91.3 million for the six months ended December 2020, as well as $37.4 million in accounts receivable for the quarter ended December 2019.  SelectQuote also reported an LTV for Medicare Advantage policies of $1,268 per policy for the three months ended December 2019, and $1,250 per policy for the six months ended December 2019.  For Medicare Supplement policies, SelectQuote reported an LTV of $1,367 per policy for the three months ended December 2019, and $1,340 per policy for the six months ended December 2019, as well as a total revenue per Medicare Advantage and Medicare Supplement policy of $1,281 per policy.

62.     The Statements set forth above in ¶¶59-61 were materially false and misleading. In truth, SelectQuote's 2019 and 2020 cohorts were experiencing lower than estimated persistency as a result of the OEP and subsequent rapid disenrollment.  Because SelectQuote failed to write down revenue as soon as it became probable that the Company's policies would not be renewed at the estimated rates previously reported, the Company's reported revenues, earnings, and accounts receivable were improperly inflated.  In addition, SelectQuote's reported lifetime value per policy and total revenue per policy were also improperly inflated.

## THE TRUTH EMERGES

63.     The truth began to emerge on May 11, 2021, when Defendant Sadun announced that the Company's fourth quarter financial results would be taking "negative cohort and tail adjustments" due to "lower second-term persistency for the 2019 cohort" the Company was experiencing as a result of the new OEP season.  When analysts sought clarification regarding

18

the underperformance of a two-year-old cohort, Defendant Sadun stated that the "specific cohort has been underreporting" and blamed this decrease in persistency on "the ability for Seniors to change more frequently," a reality that had been in place since early 2019.  As a result of these disclosures, SelectQuote's shares declined by $5.50 per share, or 20%.

64.     Despite these disclosures, the Company continued to misrepresent the extent of the impact the OEP was having on its cohort persistency.  For example, on that same conference call, Defendant Sadun maintained that the Company was "not seeing the same dynamic with later cohorts tha[t] we are with 2019 cohort."

65.     In addition, on May 18, 2021, SelectQuote executives presented at the RBC Capital Markets Healthcare Conference, during which Defendant Sadun claimed that "the 2019 cohort had persistency assumptions from prior years that didn't include the type of switching activity" seen during OEP and claimed, "the later cohorts now capture that type of activity with respect to OEP switching."

66.     The statements set forth above in ¶¶64-65 were materially false and misleading.  In truth, the later cohorts had not fully captured the OEP switching.  SelectQuote's 2020 cohort was also experiencing a lower than estimated persistency as a result of the OEP and subsequent rapid disenrollment.  As a result, SelectQuote failed to write down revenue as soon as it became probable that the Company's 2020 cohort would not be renewed at the estimated rates previously reported.

67.     Then, on August 25, 2021, SelectQuote disclosed that its persistency miscalculations were not limited to just the 2019 cohort, and in fact that "actual persistency in 2019 and 2020 has trended below initial model."  In addition, the Company announced a $65 million placeholder for the risk of an additional cohort tail adjustment the following year, mostly

driven by lower-than-anticipated persistency in the 2020 cohort. On this news, the Company's share price fell an additional $6.46, or 45%.

## LOSS CAUSATION

68.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of SelectQuote shares and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of SelectQuote's shares fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of SelectQuote's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired; (a) the publicly traded common stock of SelectQuote during the Class Period; or (b) SelectQuote common stock in or traceable to the Company's Offering. Excluded from the Class are Defendants and their families, Directors, and officers of SelectQuote and their families and affiliates.

70.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of August 26, 2021, SelectQuote had over 165 million shares of common stock outstanding, owned by hundreds or thousands of investors.

71.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        (a)     Whether Defendants violated the Securities Act and/or the Exchange Act;

        (b)     Whether Defendants omitted and/or misrepresented material facts;

        (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        (d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

        (e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

        (f)     Whether Defendants' conduct impacted the price of SelectQuote common stock;

        (g)     Whether Defendants' conduct caused the members of the Class to sustain damages;

        (h)     The extent of damage sustained by Class members and the appropriate measure of damages.

72.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

73.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

74.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

75.     All other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

76.     SelectQuote's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

77.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of SelectQuote who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

78.     At all relevant times, the market for SelectQuote's common stock was an efficient market for the following reasons, among others:

(a)     SelectQuote's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, SelectQuote filed periodic public reports with the SEC and NYSE;

(c)     SelectQuote regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     SelectQuote was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for SelectQuote's shares promptly digested current information regarding SelectQuote from all publicly available sources and reflected such information in the price of SelectQuote common stock.   Under these circumstances, all purchasers of SelectQuote common stock during the Class Period suffered similar injury through their purchase of SelectQuote common stock at artificially inflated prices and the presumption of reliance applies.

80.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's reported revenues, earnings, and accounts receivable figures – information that Defendants were obligated to correct – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of each cohort's persistency and the impact those figures had on SelectQuote's recognized revenue, that requirement is satisfied here.

## CAUSES OF ACTION

### COUNT I

**For Violations of Section 11 of the Securities Act**
**Against All Defendants**

81.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

82.     This Count is brough pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired SelectQuote common stock sold pursuant or traceable to the Offering, and who were damaged thereby.

83.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

84.     SelectQuote is the registrant for the Offering.  The Defendants were responsible for the contents and dissemination of the Offering Materials.

85.     As the issuer of the shares, SelectQuote is strictly liable for the misstatements and omissions contained in the Offering Materials.

86.     Liability under this Count is predicated on the Individual Defendants signing of the Registration Statement for the Offering, and all Defendants' respective participation in the Offering, which was conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

87.     The value of SelectQuote common stock has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired SelectQuote common stock in and/or traceable to the Offering.

88.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

89.     By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class pursuant to Section 11(e).

### COUNT II

**For Violations of Section 12(a)(2) of the Securities Act
Against the Underwriter Defendants**

90.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

91.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired SelectQuote common stock in and/or traceable to the Offering and who were damaged thereby.

92.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

93.     The Underwriter Defendants were statutory sellers of SelectQuote shares that were registered in the Offering pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold millions of SelectQuote shares through the Offering to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the Offering by means of the materially false and misleading Offering Materials.

94.     The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

95.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

96.     By reason of the foregoing, Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased SelectQuote common shares in and/or traceable to the Offering, and who were damaged thereby.

**COUNT III**

**For Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

97.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

98.     This Count is brough pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired SelectQuote common stock in and/or traceable to the Offering, and who were damaged thereby.

99.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

100.    As set forth in Count One above, SelectQuote is strictly liable under Section 11 of the Securities act for untrue statements and omissions of material fact in the Offering Materials.

101.    The Individual Defendants, by virtue of their positions, voting power, ownership, rights as against SelectQuote, and/or specific acts were, at all time of the wrongs alleged herein

and as set forth herein, controlling persons of SelectQuote within the meaning of Section 15 of the Securities Act.  These defendants also had the power and influence, and exercised the same, to cause SelectQuote to engage in the acts described herein, including by causing SelectQuote to conduct the Offering pursuant to the Offering Materials.  The Company, meanwhile, controlled the Individual Defendants and all of its employees.

102.    By reason of the foregoing, the defendants named herein each were culpable participants in the violations of Section 11 and 12(a)(2) of the Securities Act as alleged in Counts One and Two above, based on their having signed or authorized the signing of the Registration Statement and/or having otherwise participated in the process that allowed the Offering to be successfully completed.  The defendants named herein are liable for the aforesaid wrongful conduct and are liable, to the same extent that SelectQuote is liable under Section 11 of the Securities Act, to members of the Class who purchased or otherwise acquired SelectQuote common stock sold pursuant or traceable to the Offering, and who were damaged thereby.

## COUNT IV

**For Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against SelectQuote and the Officer Defendants**

103.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

104.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase SelectQuote's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

105.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SelectQuote's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

106.    SelectQuote and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SelectQuote's financial well-being and prospects, as specified herein.

107.    During the Class Period, SelectQuote and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

108.    The Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Officer Defendants engaged in this misconduct to conceal SelectQuote's true condition from the investing public and to support the artificially inflated prices of the Company's shares.

109.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SelectQuote's shares.  Plaintiff and the

Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for SelectQuote shares had been artificially inflated by these defendants' fraudulent course of conduct.

110.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their representative purchases of the Company's shares during the Class Period.

111.    By virtue of the foregoing, SelectQuote and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V

**For Violations of Section 20(a) of The Exchange Act**
**Against the Officer Defendants**

112.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

113.    The Officer Defendants acted as controlling persons of SelectQuote within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114.   As set forth above, SelectQuote and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)   As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

(e)   Awarding such equitable/injunctive or other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  October 7, 2021                    _/s/ Hannah Ross_____

                                           Hannah Ross
                                           Avi Josefson
                                           Scott R. Foglietta
                                           **BERNSTEIN LITOWITZ BERGER**
                                             **& GROSSMANN LLP**
                                           1251 Avenue of the Americas
                                           New York, NY 10020
                                           Telephone: (212) 554-1400
                                           Facsimile: (212) 554-1444
                                           hannah@blbglaw.com
                                           avi@blbglaw.com
                                           scott.foglietta@blbglaw.com

                                           *Counsel for Plaintiff West Palm Beach Police
                                           Pension Fund*


                                           Robert D. Klausner
                                           Bonni S. Jensen
                                           **KLAUSNER KAUFMAN JENSEN**
                                             **& LEVINSON**
                                           7080 Northwest 4th Street
                                           Plantation, FL 33315
                                           Telephone: (954) 916-1202
                                           bob@robertdklausner.com
                                           bonni@robertdklausner.com

                                           *Additional Counsel for West Palm Beach
                                           Police Pension Fund*

## CERTIFICATION PURSUANT TO
## <u>THE FEDERAL SECURITIES LAWS</u>

I, Jonathan Frost, on behalf of West Palm Beach Police Pension Fund ("West Palm Beach Police"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Chairman of West Palm Beach Police.  I have reviewed the complaint with our legal counsel.  Based on legal counsel's knowledge and advice, West Palm Beach Police has authorized the filing of the complaint.

2.  West Palm Beach Police did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  West Palm Beach Police is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  West Palm Beach Police's transactions in the SelectQuote, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5.  West Palm Beach Police has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6.  West Palm Beach Police will not accept any payment for serving as a representative party on behalf of the Class beyond West Palm Beach Police's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 06th day of October, 2021.

Digitally signed by Jonathan Frost
DN: cn=Jonathan Frost, o=West Palm
Beach Police Pension Fund, ou,
email=Trustee@wpbppf.com, c=US
Date: 2021.10.06 16:38:24 -04'00'

Jonathan Frost
Chairman
*West Palm Beach Police Pension Fund*

**West Palm Beach Police Pension Fund**
**Transactions in SelectQuote, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 05/21/2020 | 753 | 20.0000 |
| Purchase | 05/21/2020 | 5,017 | 27.0162 |
| Purchase | 06/05/2020 | 2,086 | 27.2405 |
| Purchase | 06/25/2020 | 77 | 26.1029 |
| Purchase | 06/25/2020 | 302 | 25.9825 |
| | | | |
| Sale | 11/13/2020 | (1,903) | 19.5705 |
| Sale | 08/26/2021 | (1,879) | 9.1979 |
| Sale | 08/26/2021 | (2,163) | 8.3170 |
| Sale | 08/26/2021 | (123) | 10.1703 |
| Sale | 08/26/2021 | (2,167) | 7.8673 |